1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9

10

11  W. C. SPIVEY, III,                    Case No. 1:12-cv-00206-LJO-SKO-HC

12          Petitioner,                   FINDINGS AND RECOMMENDATIONS TO
                                          DENY THE PETITION FOR WRIT OF
13                                         HABEAS CORPUS (DOC. 1) AND TO ENTER
        v.                                JUDGMENT FOR RESPONDENT
14
                                          FINDINGS AND RECOMMENDATIONS TO
15  CONNIE GIPSON, Warden,                 DECLINE TO ISSUE A CERTIFICATE OF
                                          APPEALABILITY
16          Respondent.
                                          **OBJECTIONS DEADLINE:**
17  _____        **THIRTY (30) DAYS**

18

19        Petitioner is a state prisoner proceeding pro se and in forma

20  pauperis with a petition for writ of habeas corpus pursuant to 28

21  U.S.C. § 2254.  The matter has been referred to the Magistrate Judge

    pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.
22
    Pending before the Court is the petition, which was filed on
23
    February 13, 2012.
24
          I.   Jurisdiction
25
          Because the petition was filed after April 24, 1996, the
26
    effective date of the Antiterrorism and Effective Death Penalty Act
27
    of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v.
28
    Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002,

                                    1

1004 (9th Cir. 1999).

The challenged judgment was rendered by the Superior Court of the State of California, County of Merced (MCSC), located within the territorial jurisdiction of this Court. 28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d). Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights.

The Court concludes that it has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which authorize a district court to entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States. Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. - , -, 131 S.Ct. 13, 16 (2010) (per curiam).

An answer was filed on behalf of Respondent Connie Gipson who had custody of Petitioner at the California State Prison at Corcoran, California, his institution of confinement at the time the petition and answer were filed. (Doc. 24.) Petitioner thus named as a respondent a person who had custody of Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules). See, Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).

Accordingly, the Court concludes that it has jurisdiction over the person of the Respondent.

II.  Procedural Summary

Petitioner is serving a sentence of life without the

2

possibility of parole that was imposed in the MCSC in May 2009 for first degree murder in the attempt to commit robbery and with use of a knife, and attempted robbery with prior convictions.  The judgment was affirmed (case number F058019) by the Court of Appeal of the State of California, Fifth Appellate District (CCA).  (LD 1, 2; LD 4 at 15.) [1]  The California Supreme Court (CSC) denied Petitioner's petition for review summarily on November 10, 2010 (case number S186005).  (LD 6.)

On February 17, 2011, Petitioner filed in the MCSC a habeas petition raising the prosecution's failure to disclose material favorable evidence.  (LD 7.)  The petition was denied on April 4, 2011, by the MCSC, which reasoned that the Petitioner's contentions did not constitute newly discovered evidence, all claims were raised or could have been raised on appeal, and Petitioner had failed to establish an exception to the rule barring reconsideration of the claims.  The MCSC cited In re Harris, 5 Cal.4th 813, 825-26 (1993) and In re Waltreus, 62 Cal.2d 218, 225 (1965).  (LD 8 at 2.)

On February 8, 2012, Petitioner filed his petition here.  (Doc. 1.)  The initial petition was not fully verified.  On March 19, 2012, Petitioner filed a verification of his petition with a copy of the initial petition.  (Doc. 10.)

On November 1, 2012, Respondent filed an answer to the federal petition.  (Doc. 24.)  Petitioner filed a traverse on November 19, 2012.  (Doc. 27.)

III.  Factual Summary

In a habeas proceeding brought by a person in custody pursuant

---

[1] "LD" refers to documents lodged in connection with the answer filed on November 1, 2012.

3

to a judgment of a state court, a determination of a factual issue
made by a state court shall be presumed to be correct; the
petitioner has the burden of producing clear and convincing evidence
to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1);
Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).  This
presumption applies to a statement of facts drawn from a state
appellate court's decision.  Moses v. Payne, 555 F.3d 742, 746 n.1
(9th Cir. 2009).  The following statement of facts is taken from
the opinion of the CCA in People v. W. C. Spivey III, case number
F058019, filed on July 30, 2010.

> On the morning of December 27, 2005, Gonzalo Ceja heard
> his uncle Gavino Mendoza call him. Ceja went outside and
> saw his uncle on the ground and saw a man with a knife. He
> heard the man tell his uncle, time after time, to give him
> the money. With a metal tool in his hand, Ceja ran at the
> man and got to within 12 to 15 feet of him before he took
> off. Three days later, his uncle died of complications
> from a stab wound to the abdomen. From a photographic
> lineup and at trial, Ceja identified the man as W.C.
> Spivey III.

People v. W. C. Spivey III, no. F058019, 2010 WL 2981538, at *1
(July 30, 2010).

IV.   Photographic Line-up

Petitioner argues his conviction is based on Gonzalo Ceja's
identification, which proceeded from what Petitioner alleges was an
unconstitutionally suggestive photographic line-up presented to Ceja
on January 31, 2006.  (Pet., doc. 1 at 4, 7-11.)

A.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on
behalf of a person in custody pursuant to the
judgment of a State court shall not be granted
with respect to any claim that was adjudicated

4

on the merits in State court proceedings unless
the adjudication of the claim-

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as

opposed to the dicta, of the decisions of the Supreme Court as of

the time of the relevant state court decision. Cullen v.

Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.

Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362,

412 (2000).

A state court's decision contravenes clearly established

Supreme Court precedent if it reaches a legal conclusion opposite

to, or substantially different from, the Supreme Court's or

concludes differently on a materially indistinguishable set of

facts. Williams v. Taylor, 529 U.S. at 405-06. A state court

unreasonably applies clearly established federal law if it either 1)

correctly identifies the governing rule but then applies it to a new

set of facts in an objectively unreasonable manner, or 2) extends or

fails to extend a clearly established legal principle to a new

context in an objectively unreasonable manner. Hernandez v. Small,

282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529

5

U.S. at 407.  An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable.  <u>Williams</u>, 529 U.S. at 410.  A state court's determination that a claim lacks merit precludes federal habeas relief as long as fairminded jurists could disagree on the correctness of the state court's decision.  <u>Harrington v. Richter</u>, 562 U.S. -, 131 S.Ct. 770, 786 (2011).  Even a strong case for relief does not render the state court's conclusions unreasonable.  <u>Id.</u>  To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Id.</u> at 786-87.

The § 2254(d) standards are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof.  <u>Cullen v. Pinholster</u>, 131 S.Ct. at 1398. Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA.  <u>Wetzel v. Lambert</u>, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the

6

state court that adjudicated the claim on the merits." <u>Cullen v.</u>
<u>Pinholster</u>, 131 S.Ct. at 1398.  Evidence introduced in federal court
has no bearing on review pursuant to § 2254(d)(1).  <u>Id.</u> at 1400.
Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding
brought by a person in custody pursuant to a judgment of a state
court, a determination of a factual issue made by a state court
shall be presumed to be correct; the petitioner has the burden of
producing clear and convincing evidence to rebut the presumption of
correctness.  A state court decision on the merits based on a
factual determination will not be overturned on factual grounds
unless it was objectively unreasonable in light of the evidence
presented in the state proceedings.  <u>Miller-El v. Cockrell</u>, 537 U.S.
322, 340 (2003).

With respect to each claim raised by a petitioner, the last
reasoned decision must be identified to analyze the state court
decision pursuant to 28 U.S.C. § 2254(d)(1).  <u>Barker v. Fleming</u>, 423
F.3d 1085, 1092 n.3 (9th Cir. 2005); <u>Bailey v. Rae</u>, 339 F.3d 1107,
1112-13 (9th Cir. 2003).  Here, the last reasoned decision on
Petitioner's claim concerning the identification is the decision of
the CCA.

Pursuant to § 2254(d)(2), a habeas petition may be granted only
if the state court's conclusion was based on an unreasonable
determination of the facts in light of the evidence presented in the
state court proceeding.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001
(9th Cir. 2004).  For relief to be granted, a federal habeas court

must find that the trial court's factual determination was such that a reasonable fact finder could not have made the finding; that reasonable minds might disagree with the determination or have a basis to question the finding is not sufficient.  Rice v. Collins, 546 U.S. 333, 340-42 (2006).

B.   The State Court's Decision

The pertinent portion of the decision of the CCA is as follows:

Photographic Lineup Issue

Spivey argues that an unduly suggestive photographic lineup prejudiced him. The Attorney General argues, in the alternative, that the lineup was not suggestive, that the lineup was reliable even if suggestive, and that error, if any, in the admission of the evidence was harmless.

On May 19, 2008, Spivey moved to suppress his photographic identification by eyewitness Gonzalo Ceja at an interview at a restaurant in Mexico on January 31, 2006. Characterizing the procedure as unduly suggestive, the motion argued that "[1] the words that Mr. Ceja spoke were ignored by the officers; [2] words that he did not say were translated in their place; and [3] the conduct of the officers before, during and after the purported identification have so tainted the process that it cannot be removed." FN2

FN2. Spivey notes the same three points in his argument on appeal but mentions the first two only in passing. Since he does not expand on the first two with either argument or citation to relevant authority, we decline to address both of those and discuss only the third. (*People v. Hardy* (1992) 2 Cal.4th 86, 150.)

At an evidentiary hearing outside the presence of the jury, two witnesses-Ceja and a bilingual detective who interviewed him-testified.FN3 (Evid.Code, § 402.) Ceja testified he said he recognized no one on the first page of photographs he saw. "Because of fear," he added. "You didn't tell them why?," Spivey's attorney inquired. "No," Ceja replied. Ceja testified that after seeing the second

8

page of photographs he pointed to one of the photographs
on the first page of photographs and said, "It's him,"
only after "they told me nothing would happen," which he
understood to mean, "That nothing bad would happen to me."

> FN3. A non-Spanish-speaking detective attended
> the bilingual detective's interview of Ceja in
> Mexico but did not testify at the hearing.

The detective testified that after Ceja saw the first page
of photographs he "didn't say anything" and he "didn't
recognize anybody" and that after he identified no one in
the second page of photographs, either, he took another
look at the first page of photographs, from which he
identified the person "he believes is the suspect." No one
suggested to Ceja which photograph to pick out.

Substantially congruent with the evidence at the hearing,
the interview transcript shows, *inter alia*, the following:
FN4

> FN4. For brevity and clarity, the transcript is
> edited to delete the Spanish of Ceja and the
> bilingual detective, the English of the other
> detective, and other superfluities.

> "[DETECTIVE:] In a moment we are going to show
> you a group of photos.

> "[CEJA]: Uh-huh (affirmative)[.]

> "[DETECTIVE:] In these groups of photos ah they
> may or may not contain the picture of the
> suspect.

> "[CEJA]: Uh-huh (affirmative)[.]

> "[DETECTIVE:] Remember that the style of hair,
> mustache or beard may have changed. Ah, also the
> photos may not demonstrate the true complexion
> it may be darker or lighter don't pay any
> attention to marks or numbers that the photos
> may have. Remember, you are not obligated to
> choose one.

> "[CEJA]: Uh-huh (affirmative)[.]

1   "[DETECTIVE:] It's important that if the person
    is not there don't say that they are. If the
2   person is tell me so that you know, so that we
    can get the suspect. After reviewing all the
3   photos ah tell me yes or no if you recognize the
    person that committed the crime. Hmm, don't
4   speak to anyone about this case, okay?
5
    "[CEJA]: Uh-huh (affirmative)[.][¶] ... [¶]
6
7   "[DETECTIVE:] We are going to show you six
    photographs ... [¶] ... and tell me if one of
8   these six is the one that stabbed your uncle.
    [¶] ... [¶] ... (PAUSE) [¶] ...
9
    "[DETECTIVE:] No?-
10
11  "[CEJA]: No. [¶] ... [¶]

12  "[DETECTIVE:] [W]e have another. [¶] ... [¶]
    Same thing[.][¶] (PAUSE) [¶] ... [¶] Does he
13  look like?
14
    "[CEJA]: The one that looks more like is the
15  (unintelligible) the one in the other photo.
16
    "[DETECTIVE:] Which one? Show him the first
17  photo lineup real quick-. [¶] ... [¶] Yea. He
    says that one right there looks like him.-
18
19  "[CEJA]: But no, it's not. [¶] ... [¶]
20
    "[DETECTIVE:] ... How sure are you, does it look
    like? He looks like?
21
22  "[CEJA]: He looks like but, he is not. [¶] ...
    [¶]
23
    "[DETECTIVE:] From one to a hundred how sure are
24  you? [¶] ... [¶] One to ten? Eight, nine?
25  "[CEJA]: Eight. Seven, seven, eight[.]
26
    "[DETECTIVE:] He said eight, seven, eight a good
27  eight he's sure that's him. That's ah, yea he
    says that one right there he's close to eight-
28  [¶] ... [¶]

"[CEJA]: Uh-huh (affirmative)[.][¶] ... [¶]

"[DETECTIVE:] The other five do they look like?
No? [¶] ... [¶]

"[DETECTIVE:] Are you sure?

"[CEJA]: I'm sure[.][¶] ... [¶]

"[DETECTIVE:] We came a long distance and if
that's the one that looks like

"[CEJA]: He looks like this one. [¶] ... [¶]
This one looks the best. [¶] ... [¶]

"[DETECTIVE:] Okay, ... I'm going to explain
something else to you. Is that the person who
committed the crime or is that the person who
looks like the person who committed the crime?

"[CEJA]: That looks like the person."

At the hearing, Spivey argued, "You can hear on the tape
that we played earlier that the officers are very subdued
when he says he doesn't see anybody, and very elated when
he goes back to the same group and selects the person that
they had targeted. And it's inevitable that the witness
will be influenced by that, and has been influenced by
that and, therefore, any in-court identification procedure
has been irreversibly tainted by that and should not be
permitted to happen."

After hearing Ceja and the detective testify, listening to
the recording of the interview, reading the transcript of
the interview, admitting both the recording and the
transcript in evidence, and hearing argument by counsel,
the court denied the motion, finding no "intentional or
unintentional effort to try to steer the witness into
choosing a particular photo in the lineup."

On appeal, the standard of independent review applies to a
trial court's ruling that a pretrial identification
procedure was not unduly suggestive. (*People v. Kennedy*
(2005) 36 Cal.4th 595, 609 (*Kennedy*), disapproved on
another ground by *People v. Williams* (2010) 49 Cal.4th
405, 459.) To determine whether a procedure is unduly

11

suggestive, our duty is to inquire whether anything caused
the defendant to stand out from the others in a way that
would suggest the witness should select him. (*People v.
Yeoman* (2003) 31 Cal.4th 93, 124 (*Yeoman*).) The defendant
bears the burden of demonstrating the existence of an
unreliable identification procedure. (*People v. Cunningham*
(2001) 25 Cal.4th 926, 989.) Our independent review of the
record, including the evidence at the hearing, persuades
us that the identification procedure was not unduly
suggestive. That obviates the need to make a determination
of the reliability of the resulting identification and
disposes of Spivey's due process claim. (*Yeoman, supra*, 31
Cal.4th at p. 125.)

Even so, assuming arguendo the identification procedure
was unduly suggestive, the court's ruling admitting the
evidence was proper if the evidence was reliable under the
totality of the circumstances. (*Kennedy, supra*, 36 Cal.4th
at p. 610, citing *Neil v. Biggers* (1972) 409 U.S. 188, 199
*(Biggers)*.) The United States Supreme Court has
"identified the factors to be considered in determining
the reliability of the identification as including 'the
opportunity of the witness to view the criminal at the
time of the crime, the witness' degree of attention, the
accuracy of the witness' prior description of the
criminal, the level of certainty demonstrated by the
witness at the confrontation, and the length of time
between the crime and the confrontation.'" (*Kennedy,
supra*, at p. 610, quoting *Biggers, supra*, at pp. 199-200.)
Ceja saw the perpetrator's face from a distance of only 12
to 15 feet as he ran right toward him with a metal ruler
in his hand. To the question how sure he was, on a scale
of one to 10, that the photograph of Spivey looked like
the perpetrator, he replied, "Eight. Seven, seven, eight."
Only a month or so separated the crime from the
identification procedure in Mexico. Weighing all the
factors, we conclude there was no substantial likelihood
of misidentification. The court properly allowed the
evidence to go to the jury.

Even so, assuming arguendo the court erred by denying
Spivey's motion, our duty is to determine if there was
prejudice. Compelling evidence of his guilt is in the
record entirely independent of Ceja's identification of
him as the perpetrator. His girlfriend's sister, with whom
he and his girlfriend were living on and off at the time,
testified she saw him taking knives out of her kitchen

drawer around Christmas of 2005. She told him, "Don't mess with my knives. Don't take nothing out of my kitchen." At some point he told her he had stabbed some "Mexican dude" and said, "I think I killed him." She told her, "You should just leave my house then." Blood was on his sweater, on his shoes, and on some white tissues. Later he told her he got rid of the clothes but did not say where.

On another occasion sometime around Christmas of 2005, Spivey's girlfriend's sister saw him and "some other guys" jumping "two Mexican guys" and "fighting on the grass" with them. She saw him "hitting them and stuff" and taking a watch, a phone, and some credit cards out of their pockets. On yet another occasion sometime around Christmas of 2005, she saw a man who had a black eye and other injuries and who looked as if he had taken a beating talk with the "boss man" at a store and point at Spivey.

Spivey's attorney and the prosecutor argued to the jury the strengths and weakness of the identification procedure, so the jury was keenly aware of the need to weigh that evidence with care during deliberations. Short of "'a very substantial likelihood of irreparable misidentification,'" identification evidence "is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Manson v. Braithwaite* (1977) 432 U.S. 98, 116, quoting *Simmons v. United States* (1968) 390 U.S. 377, 384.) Error, if any, in the denial of Spivey's motion was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 .)

People v. Spivey, 2010 WL 2981538, at *1-*4.

        C.   Analysis

Due process of law requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, - U.S. -, 132 S.Ct. 716, 718, 724 (2012);

Manson v. Brathwaite, 432 U.S. 98, 107-09 (1977); Neil v. Biggers, 409 U.S. 188, 196-98 (1972).  An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, such as by repeated presentation of a subject, gross disparities in appearance, or other circumstances or behavior that direct attention to a particular subject, and thereby increases the likelihood of misidentification.  United States v. Bagley, 772 F.2d 482, 492-93 (9th Cir. 1985) (citing Simmons v. United States, 390 U.S. 377, 382-83 (1968)).

The presence of improper state conduct in arranging and conducting unnecessarily suggestive pretrial identification procedures and the reliability of the identification are both considered in determining whether evidence of the identification must be excluded.  Manson v. Brathwaite, 432 U.S. at 100-14. Identification testimony is inadmissible as a violation of due process only if 1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and 2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Perry v. New Hampshire, 132 S.Ct. at 720.

In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: 1) the witness's opportunity to view the defendant at the time of the incident; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description; 4) the level of certainty

14


demonstrated by the witness at the time of the identification procedure; and 5) the length of time between the incident and the identification. <u>Perry</u>, 132 S.Ct. at 725 n. 5; <u>Manson</u>, 432 U.S. at 114; <u>Neil</u>, 409 U.S. at 199-200.  To warrant habeas relief, a suggestive identification must have a substantial or injurious effect or influence in determining the jury's verdict. <u>Williams v. Stewart</u>, 441 F.3d 1030, 1039 (9th Cir. 2006), <u>cert. denied</u>, 549 U.S. 1002 (2006) (per curiam).

Here, the state court articulated standards consistent with clearly established federal law, analyzed the relevant circumstances, and reasonably applied the law.  The procedures undertaken by the state court to evaluate Petitioner's claim were thorough and balanced.  The circumstances surrounding the identification were not suggestive.  The witness was informed that the perpetrator might not be in the photos and that the witness had no obligation to identify anyone.  The evidence supported the conclusion that there had been no effort to focus the witness's attention on any one person depicted in the photographs; although the witness initially saw no one in either collection of photos, it appears the witness himself indicated that someone in the first array looked like the perpetrator.  Although the witness indicated more than once that the person he identified was not the actual perpetrator, when officers asked for clarification of the certainty of the identification, the witness indicated a relatively high degree of certainty as to the resemblance and never articulated any basis for distinguishing the suspect from the perpetrator.

The state court properly concluded that the identification was not characterized by a substantial likelihood of misidentification

15

considering the pertinent circumstances, including the opportunity

the witness had to view the perpetrator from a distance of twelve to

fifteen feet, the degree of certainty shown by the witness, and the

brief one month interval between the offense and the identification.

The circumstances of the identification did not resemble those that

have been recognized as tending to produce an unreliably suggestive

identification, such as law enforcement officers' identifying the

suspect before the identification, line-ups being presented to

multiple witnesses together, using a single suspect or a very small

number of subjects, allowing a view of the suspect before a more

standard line-up is conducted, repeatedly presenting only the

suspect in a series of line-ups, and highlighting the suspect by

presenting him with others who all lack a distinctive physical

characteristic (race, height, age, clothes worn by the perpetrator,

etc.) of the suspect.  See United States v. Wade, 388 U.S. 218, 232-

34 (1967); Foster v. California, 394 U.S. 440, 443 (1969).

The evidence also supported the conclusion that Petitioner did

not suffer prejudice.  The tape and transcript of the identification

were in evidence, and the witness and the officer present at the

interview were carefully and thoroughly cross-examined regarding the

identification; any suggestive aspects could be perceived and

assessed by the trier of fact, and thus any prejudice could be

mitigated.  See Simmons v. United States, 390 U.S. 377, 384 (1968).

The record included the testimony of an apparently unbiased witness,

who was relatively close to Petitioner because of Petitioner's

relationship with her sister, regarding Petitioner's access to

knives, his admission that he had stabbed and probably killed a

Mexican man, and her observation of Petitioner with blood on his

16

clothes he later admitted he had discarded.  Under these
circumstances, it was reasonable for the state court to conclude
that even if there had been some suggestiveness in the
identification, it was not prejudicial.  Any error did not have a
substantial or injurious effect or influence in determining the
jury's verdict.  See Williams v. Stewart, 441 F.3d at 1039.

     In the traverse, Petitioner challenges the sufficiency of the
testimony of Ortiz, Ceja, and Detective Dash as unreliable and
false, and challenges the accuracy because he claims he informed
Ortiz he had stabbed a man in the kidney, whereas the victim's
wounds were in the abdominal area.  (Trav., doc. 27, 4-7.)  To the
extent Petitioner intends to raise an additional claim not set forth
in the petition, the Court declines to consider new matter presented
for the first time in the traverse.  See Cacoperdo v. Demosthenes,
37 F.3d 504, 507 (9th Cir. 1994), cert. den., 514 U.S. 1026 (1995).
The totality of the evidence, however, supports the reliability of
the identification.

     In summary, it will be recommended that Petitioner's due
process claim of a prejudicially suggestive identification be
denied.

     V.   Brady Violation[2]

     Petitioner argues he suffered a prejudicial violation of his
due process rights when the prosecution failed to disclose the
actual audio recording of an interview on October 26, 2007, with
Nicole Bell, mother of Spivey's girlfriend, Ora Knowles.  In the
interview, Bell stated that she thought Petitioner was in Atwater
with Dorothy Hinton, Knowles's aunt, for a period of time that

---

[2] The reference is to Brady v. Maryland, 373 U.S. 83 (1963).

coincided with the homicide and that was longer than the time recorded in the report of the interview.  (Pet., doc. 1 at 4, 13-22.)  Petitioner also suffered a violation from the prosecution's failure to disclose evidence that a neighbor translated a conversation between an officer and Ceja.

A.   The State Court's Decision

The last reasoned decision on this issue is the decision of the CCA, which provides in pertinent part as follows:

Spivey argues that the denial of his new trial motion on the ground of the prosecution's withholding of discovery prejudiced him. The Attorney General argues the contrary.

On March 17, 2009, Spivey's attorney filed a new trial motion arguing that the prosecution's withholding of two items of evidence-a district attorney's investigator's interview of his girlfriend's mother and a translator's presence at a crime scene police interview of Ceja-"'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (*Kyles v. Whitley* (1995) 514 U.S. 419, 435; *Brady v. Maryland* (1963) 373 U.S. 83 *(Brady)*.)

As to the interview of the girlfriend's mother, Spivey's motion noted that the investigator conducted the interview at the district attorney's request and filed a report on October 27, 2007, which stated that the girlfriend's mother, her daughter, and Spivey all stayed at a relative's house in Atwater "starting a day or two before Christmas, and stayed for approximately three days total." On May 21, 2009, Spivey made a supplemental filing that compared the report with a recording of the interview and argued that the recording was inculpatory, not exculpatory.FN5 His supplemental filing acknowledged her statement in the report but emphasized her later statement in the recording that "if I'm not mistaken, it was two days before Christmas, and like three days after Christmas. So we came home like maybe the 28th, the 28 or the 29th."

FN5. The defense received the police report and the recording from the prosecutor after trial.

18

As to the translator's presence at the crime scene
interview, Spivey's motion noted that the defense found
out during cross-examination of Ceja that a neighbor
helped him communicate the perpetrator's description to a
police officer by translating. The officer made no mention
of the neighbor in either his police report or his
preliminary hearing testimony.

On April 20, 2009, the prosecutor filed an opposition to
the motion arguing that the investigator's interview
yielded immaterial inculpatory, not material exculpatory,
evidence, as to which no duty to disclose ever arose, and
that the prosecution had no knowledge of "the use or non-
use of an interpreter," which was of "no consequence"
since the photographic lineup occurred not at the crime
scene but in Mexico "a few weeks after the murder."

On May 15, 2009, the court heard argument on the motion.
On May 21, 2009, the court listened to the recording of
the investigator's interview, heard additional argument,
analyzed the evidence under both *Brady* and section
1054.1,FN6 and denied the motion.

> FN6. Section 1054.1 requires the prosecutor to,
> inter alia, "disclose to the defendant or his or
> her attorney all of the following materials and
> information, if it is in the possession of the
> prosecuting attorney or if the prosecuting
> attorney knows it to be in the possession of the
> investigating agencies: [¶] ... [¶] (e) Any
> exculpatory evidence. [¶] (f) Relevant written
> or recorded statements of witnesses or reports
> of the statements of witnesses whom the
> prosecutor intends to call at the trial...."

Our duty is to apply the deferential abuse of discretion
standard of review and to let the court's denial of
Spivey's new trial motion stand unless he establishes a
manifest and unmistakable abuse of discretion. (*People v.
Thompson* (2010) 49 Cal.4th 79, 140; *People v. Hoyos* (2007)
41 Cal.4th 872, 917, fn. 27.) Challenging the court's
finding of no constitutional violation as an abuse of
discretion, he invokes the settled rule that the
suppression by the prosecution of favorable evidence
violates due process where the evidence is material to
guilt or punishment, whether or not the prosecution acted
in good faith or bad faith, whether or not the defense

19

made a request, and whether or not the evidence was exculpatory or impeaching. (*Hoyos, supra*, at p. 917, citing *United States v. Bagley* (1985) 473 U.S. 667, 676 (*Bagley*); *United States v. Agurs* (1976) 427 U.S. 97, 107 (*Agurs*); *Brady, supra*, 373 U.S. at p. 87.) Only if the evidence is material-that is, "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'"-is he entitled to relief. (*Hoyos, supra*, at pp. 917-918, quoting *Bagley, supra*, at p. 682.) He has the burden of showing materiality. (*Hoyos, supra*, at p. 618.) On the specific issue of whether he established a *Brady* violation, we apply a *de novo* standard of review. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

Our review persuades us that there was no error. As to the interview of Spivey's girlfriend's mother, his girlfriend testified, somewhat inconsistently, that he was with her at a relative's house in Merced for every second of the four days starting on Christmas Eve. As the court observed, the evidence was exculpatory, confirming Spivey's presence "elsewhere at the time of the murder," and likewise was impeaching, contradicting the girlfriend's mother's statement that he was in Atwater at the time of the murder. Despite "a good deal of inconsistency" between the girlfriend's testimony and her mother's statement, the court found that since the jury "obviously rejected" the former and the latter "would have carried no greater weight and perhaps less weight" the requisite materiality for *Brady* relief was lacking. The absence of a *Brady* violation precludes a section 1054.1 violation. (*People v. Tillis* (1998) 18 Cal.4th 284, 294; § 1054, subd. (e).)

As to the translator's presence at the crime scene interview, both counsel, as the court noted, questioned the officer and agreed to release him from subpoena to take care of an important family matter before the issue of "whether or not there was a translator present" arose. The court characterized the issue as a "new revelation" during trial and emphasized that "both the prosecution and the defense at that point could have taken," but did not take, "appropriate investigative steps" to "flush out [sic] that inconsistency."

Finally, Spivey argues that the prosecution withheld

20

evidence of a police officer's destruction of a
photographic lineup Ceja signed indicating he could
identify no one even though Spivey's photograph was among
those in the lineup. Had he received discovery of that
item, he argues, he would have conducted a *Pitchess*FN7
investigation and submitted special jury instructions.
Although he raised the issue in a discovery motion he
filed on September 24, 2008, he did not raise the issue in
the new trial motion he filed on March 17, 2009. A court
has the authority to order a new trial on the basis of a
ground in a new trial motion but not to grant a new trial
on its own motion, so the omission forfeited his right to
a new trial on that ground. (*People v. Masotti* (2008) 163
Cal.App.4th 504, 508.)

> FN7. *Pitchess v. Superior Court* (1974) 11 Cal.3d
> 531 (*Pitchess*).

Even in the absence of a forfeiture, the merits, if any,
of the *Pitchess* investigation he theorizes are entirely
speculative. "The mere possibility that an item of
undisclosed information might have helped the defense, or
might have affected the outcome of the trial, does not
establish 'materiality' in the constitutional sense."
(*Agurs, supra*, 427 U.S. at pp. 109-110.) Additionally, the
officer testified at trial he did not save the
photographic lineup since he "didn't need it. Everything
was on the digital recorder. Everything was recorded, so."
Finally, nothing precluded Spivey from submitting special
jury instructions solely on the basis of the officer's
testimony at trial. His argument is meritless.

People v. Spivey, 2010 WL 2981538, at *4-*6.

        B.  Analysis

    The Due Process Clause of the Fourteenth Amendment imposes upon

the prosecution a duty to disclose evidence in its possession that

is favorable to an accused if it is material either to guilt or

punishment.  Brady v. Maryland, 373 U.S. 83, 87-88 (1963).  The

prosecution violates its constitutional duty to disclose to the

defense material exculpatory evidence where, regardless of whether

21

the defense requested the evidence, 1) the evidence was favorable to the accused because it was either exculpatory or impeaching; 2) the evidence was suppressed by the government either willfully or inadvertently; and 3) prejudice results from the failure to disclose. Strickler v. Greene, 527 U.S. 263, 280 (1999).

Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). A court may find a "reasonable probability" where the remaining evidence would have been sufficient to convict the defendant, Strickler, 527 U.S. at 290, and even without finding that the outcome would more likely than not have been different, Kyles v. Whitley, 514 U.S. 419, 434 (1995). Instead, "[a] 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434 (quoting Bagley v. United States, 473 U.S. at 678).

Although each item of undisclosed evidence must be evaluated, the cumulative effect of all suppressed evidence is evaluated for purposes of materiality. Kyles, 514 U.S. at 436-37. Here, the state court articulated the correct legal standards concerning the due process duty of disclosure of material evidence.

As to Bell's statement, the state court reviewed the evidence and reasonably determined that even if the defense should have had access to the evidence, it was not material. Although Bell's statement placed Petitioner somewhere other than at the site of the crime, Bell's recollection was uncertain or inconsistent regarding

22

the precise length of time and when Petitioner was present.  Bell's statement also contradicted the testimony of Knowles that Petitioner had been with her beginning on Christmas Eve and that they had been in Merced.  Thus, although the statement was exculpatory, its probative tendency was diminished in light of the details of the other alibi evidence.  Further, the state court reasonably concluded that the jury had before it similarly weighty evidence of a potential alibi based on Petitioner's presence with the girlfriend and her family, yet it had rejected that evidence.  It was reasonable for the state court to conclude that in light of the totality of the evidence, the undisclosed statement did not undermine confidence in the outcome of the trial.

With respect to the mid-trial disclosure of the presence of a neighbor aiding the translation of Ceja's initial conversation with a law enforcement officer, it is undisputed that the claim was not fully developed at the trial level.  In light of Ceja's ample opportunity to observe the murderer and the fact that Ceja's identification of Petitioner occurred weeks later, the earlier presence of the neighbor at the crime scene does not appear to be material.  The state court's failure to grant relief on this claim did not offend clearly established federal law.

Finally, it is undisputed that the line-up was fully recorded.  The record also reflects that Petitioner initially identified no one from either group. Petitioner has not suggested how the destruction of only one of multiple forms of documentation of the line-up could have affected the result of the proceeding or confidence in the outcome of the trial.

1   Accordingly, it will be recommended that Petitioner's claim of

2   a due process violation based on the failure to disclose material

3   evidence be denied.

4   VI.   Peremptory Challenges

5   Petitioner, an African-American charged with killing a Latino,

6   argues he was denied his right to a fair trial when the prosecutor

7   peremptorily challenged the only two African-American jurors on the

8   panel.

9   A.   The State Court's Decision

10   The last reasoned decision on this claim was the decision of

11   the CCA, which in pertinent part stated the following:

12      Spivey argues that the court committed prejudicial
        *Batson/Wheeler*FN8 error. The Attorney General argues the
13      contrary.

14         FN8. *Batson v. Kentucky* (1986) 476 U.S. 79
15         (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258
           (*Wheeler*), overruled in part by *Johnson v.*
16         *California* (2005) 545 U.S. 162, 168 (*Johnson*).

17      A prosecutor's use of peremptory challenges to excuse a
        prospective juror on the basis of group membership
18      violates a criminal defendant's federal constitutional
        right to equal protection of the laws and state
19      constitutional right to trial by a jury drawn from a
        representative cross-section of the community. (*People v.*
20      *Gray* (2005) 37 Cal.4th 168, 183-184; 14th Amend., U.S.
        Const.; art. I, § 16, Cal. Const.) To determine if the
21      record shows a constitutional violation, we turn, first,
22      to the record and, second, to the law.

23      On May 13, 2008, Spivey's attorney made a *Batson/Wheeler*
24      motion asking for an inquiry into the prosecutor's use of
        peremptory challenges against prospective jurors 8884
25      ("number 8884") and 2400 ("number 2400"). He accused the
        prosecutor of "attempting to rid the jury of African-
26      Americans in a case where my client is an African-
        American, which is an extreme minority in this community,
27      five percent, and is accused of the homicide of a Latino,
28      which is virtually the majority in this community."

24

In reply, the prosecutor noted "several things" that concerned him about number 8884. First, she knew Spivey's attorney. The prosecutor disclaimed knowledge of the relationship but acknowledged feeling "uneasy" about it. Second, her questionnaire noted "she herself has had bad experience with the police and there's been a lot of suggestion by defense counsel that they're going to attack the credibility of the police in this case." Third, she was a social worker. In the prosecutor's experience, social workers "are very forgiving people, people that tend to try to see the good in people." Overall, he said, "I just did not get a good feeling for her as a juror."

With reference to number 2400, the prosecutor made two observations. First, since "this is going to be a case that may come down to the credibility of the police," the prosecutor expressed concern that he answered "stereotyping" to the question asking for his opinion about "problems with police/law enforcement." Second, since he noted in his questionnaire "he has a cousin that is in prison for a murder conviction," the prosecutor "thought he might identify too closely with the defendant." Overall, he said, he felt he had to choose to be "better safe than sorry because of those two answers."

Spivey's attorney added a few comments. Number 8884, he said, "has a brother who's a CHP officer. Her father, who's deceased, was a probation officer. Her uncle was a former police officer." Number 2400, he said, he has a "balanced" background since one brother has a conviction of a crime, another brother is a detective, on several occasions he was a victim of crime, and never in his life was he in trouble. He said his "answers on things like eyewitness testimony" were "right down the middle, including agreeing that a person might be afraid to come forward."

On the basis of counsel's representations and the court's own observations, the court found that the defense failed to establish a prima facie case and that the prosecutor used peremptory challenges against those two prospective jurors "for reasons other than to exclude a particular racial group from the jury." On that record, we turn to the law.

25

On a *Batson/Wheeler* motion, "the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." (*People v. Avila* (2006) 38 Cal.4th 491, 549 (*Avila*).) In the three-step constitutional analysis of peremptory challenges, the first step is for the defendant to make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. If the defendant makes out a prima facie case, the second step is for the prosecutor to explain adequately the racial exclusion by offering permissible race-neutral justifications for the peremptory challenges. If the prosecutor offers adequate justifications, the third step is for the court to decide whether the opponent of the peremptory challenges has proved purposeful racial discrimination. (*Johnson, supra*, 545 U.S. at p. 168.)

Here, of course, the inquiry stops at the first step, since the court found no prima facie case of discriminatory purpose. Even so, our duty after denial of a *Batson/Wheeler* motion without a finding of a prima facie case is to consider the entire voir dire record before us. (*People v. Howard* (1992) 1 Cal.4th 1132, 1155 .) As with other findings of fact, we analyze the record for supportive evidence. Since a ruling on a *Batson/Wheeler* motion necessarily implicates a court's own observations, we give considerable deference to the court's findings and, if the record suggests grounds on which the prosecutor might reasonably have challenged the prospective jurors at issue, our duty is to affirm. (*Ibid.*)

Spivey argues that "the prosecutor exercised peremptory challenges against the only two African-Americans who had been seated." However, the small absolute size of the sample makes drawing an inference of discrimination from that fact alone impossible. (*People v. Bonilla* (2007) 41 Cal.4th 313, 343.) Although the exclusion of even a single prospective juror may be the product of an improper group bias, as a practical matter the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion. (*Ibid.*) Additionally, the information elicited on voir dire showed race-neutral reasons for excusing both prospective jurors. Our review of the entire voir dire record persuades us the court correctly concluded that

1    Spivey failed to make a prima facie case of group bias
2    against African-Americans. (*Ibid.*) FN9

3        FN9. Ultimately finding no prima facie case, the
         court, though not required to do so, commendably
4        engaged in "the better practice" of having the
         prosecutor put on the record race-neutral
5        explanations for both peremptory challenges to
         assist constitutional analysis both below and on
6        appeal. (*People v. Bonilla, supra*, 41 Cal.4th at
7        p. 343, fn. 13.)

8   People v. Spivey, 2010 WL 2981538, at *6-*8.

9           B.   Analysis

10        Although a prosecutor is entitled to exercise peremptory
11   challenges for any reason related to his view concerning the outcome
12   of the case to be tried, the Equal Protection Clause forbids the
13   prosecutor to challenge potential jurors solely on account of their
14   race or on the assumption that African-American jurors as a group
15   will be unable impartially to consider the state's case against an
16   African-American defendant.  Batson v. Kentucky, 476 U.S. 79, 89
17   (1986).  A defendant can make out a prima facie case of
18   discriminatory jury selection by the totality of the relevant facts
19   about a prosecutor's conduct during the defendant's own trial.
20   Batson v. Kentucky, 476 U.S. at 94, 96.

21        Once the defendant makes a prima facie showing, the burden
22   shifts to the state to come forward with a neutral explanation for
23   challenging jurors within an arguably targeted class.  Id. at 97.  A
24   prosecutor must give a clear and reasonably specific explanation of
25   the legitimate reasons for exercising the challenge or challenges.
26   Id. at 98.

27        The trial court then has the duty to determine if the defendant
28   has established purposeful discrimination.  Batson v. Kentucky, 476

U.S. at 98.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995).

Under <u>Batson</u>'s first step, the defendant must establish a prima facie case of purposeful discrimination.  <u>Batson</u>, 476 U.S. at 93-94. He must show that 1) the prospective juror is a member of a cognizable racial group, 2) the prosecutor used a peremptory strike to remove the juror and 3) the totality of the circumstances raises an inference that the strike was on account of race.  <u>Id.</u> at 96; <u>Crittenden v. Ayers</u>, 624 F.3d 943, 955 (9th Cir. 2010).  A defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  <u>Johnson v. California</u>, 545 U.S. 162, 170 (2005).

With respect to the prima facie inquiry, the determination made by the trial court involves a mixed question of law and fact.  The court must determine whether the facts presented are sufficient to meet the requirements of the legal rule concerning a prima facie case.  <u>Tolbert v. Page</u>, 182 F.3d 677, 681 n.6 (9th Cir. 1999) (en banc).  Credibility findings a trial court makes in a <u>Batson</u> inquiry are generally entitled to great deference.  <u>Batson</u>, 476 U.S. at 98 n.21.  A trial court's credibility findings are reviewed in a federal habeas proceeding under 28 U.S.C. § 2254(d)(2).  <u>Rice v. Collins</u>, 546 U.S. at 338 (declining to decide whether § 2254(e)(1) also applied).  Pursuant to § 2254(d)(2), a habeas petition may be granted only if the state court's conclusion was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  For relief to be granted, a federal habeas

court must find that the trial court's factual determination was
unreasonable such that a reasonable fact finder could not have made
the finding; that reasonable minds might disagree with the
determination or have a basis to question the finding is not
sufficient.  Rice, 546 U.S. at 340-42.

Here, the state court articulated legal standards that are
consistent with the foregoing federal standards.  The court's
finding that a prima facie case of discrimination had not been made
was not unreasonable based on the record.  A fairminded jurist could
conclude that although the two jurors were African-American,
information revealed in the voir dire and jury questionnaires raised
significant, race-neutral questions concerning the jurors'
experience with, or attitudes toward, law enforcement in a case in
which the credibility of law enforcement officers was anticipated to
be an issue.  Although juror 8884 had a brother and uncle who had
been law enforcement officers, she was a social worker who admitted
having bad experiences with police and knowing Petitioner's attorney
through her work.  Juror 2400 asserted that police had a problem
with stereotyping, and he had a cousin in prison for murder, so
there was a basis for concern that he had a negative attitude toward
law enforcement.  See United States v. Thompson, 827 F.2d 1254, 1260
(9th Cir. 1987) (noting that excluding jurors because of their
profession or because of a poor attitude in answer to voir dire
questions is wholly within the prosecutor's prerogative); Mitleider
v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004) (recognizing as
legitimate, race-neutral concerns a potential juror's sibling's
criminal conviction and a panel member's poor attitude toward jury
service or inadequate answers to questions); Stubbs v. Gomez, 189

F.3d 1099, 1105 (9th Cir. 1999) (failure to make eye contact).  The state court reasonably found that considering all the circumstances, no prima facie case had been made out.

If the state court's decision that there was no prima facie case was unreasonable, even if the Batson issue were reviewed de novo, the record neither requires nor supports a conclusion that the prosecutor's challenges were racially motivated as required at step three of the Batson analysis.  Potential juror 8884's attitude toward both defense counsel and law enforcement as well as the perspective she held as a social worker were valid, race-neutral bases for peremptory challenges.  Similarly, potential juror 2400's opinion that there was a problem with police stereotyping people, in combination with having a cousin in prison for murder, warranted a concern that the person would have a bad attitude toward law enforcement; there was difficulty with eye-contact that may have affected the prosecutor's ability to understand the situation.  The trial court necessarily observed the interaction among the attorneys and potential jurors and made conclusions as to the credibility of the prosecutor, who offered his reasons.  The Court concludes that Petitioner has not shown that the prosecutor's exercise of the peremptory challenges was racially motivated.

Accordingly, it will be recommended that the Court deny Petitioner's claim that the prosecutor's exercise of peremptory challenges violated his right to equal protection of the law.

VII.  Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention

complained of arises out of process issued by a state court.  28
U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336
(2003).  A district court must issue or deny a certificate of
appealability when it enters a final order adverse to the applicant.
Habeas Rule 11(a).

A certificate of appealability may issue only if the applicant
makes a substantial showing of the denial of a constitutional right.
§ 2253(c)(2).  Under this standard, a petitioner must show that
reasonable jurists could debate whether the petition should have
been resolved in a different manner or that the issues presented
were adequate to deserve encouragement to proceed further.  Miller-
El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S.
473, 484 (2000)).  A certificate should issue if the Petitioner
shows that jurists of reason would find it debatable whether: (1)
the petition states a valid claim of the denial of a constitutional
right, and (2) the district court was correct in any procedural
ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the
claims in the habeas petition, generally assesses their merits, and
determines whether the resolution was debatable among jurists of
reason or wrong.  Id.  An applicant must show more than an absence
of frivolity or the existence of mere good faith; however, the
applicant need not show that the appeal will succeed.  Miller-El v.
Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate
whether the petition should have been resolved in a different
manner.  Petitioner has not made a substantial showing of the denial
of a constitutional right.  Accordingly, it will be recommended that

31

the Court decline to issue a certificate of appealability.

VIII.   Recommendations

In accordance with the foregoing, it is RECOMMENDED that:

1) The petition for writ of habeas corpus be DENIED;

2) Judgment be ENTERED for Respondent; and

3) The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 23, 2015**                    **/s/ Sheila K. Oberto**
                                      UNITED STATES MAGISTRATE JUDGE